Kantor, Davidoff, Wolfe, Mandelker,
Twomey & Gallanty, P.C.
By: Gary Hoppe (GH-9575)
Attorneys for Albert Sontag
  as a Temporary Receiver
51 East 42nd Street
New York, NY 10017
(212) 682-8383

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In Re:

        2271 ASSOCIATES INC., et al.,

                                    Debtors.
-----------------------------------------------------------------X

**Return Date:**
**11/2/11 – 10:00 a.m.**

Case Nos. 11-23351
Through 11-23358 (RDD)
(Chapter 11)

**NOTICE OF MOTION**

        PLEASE TAKE NOTICE that, upon the annexed affidavit of Albert Sontag

("Sontag"), sworn to September 26, 2011, the affidavit of Abraham Soloff, sworn to

September 26, 2011, the affidavit of Gary Hoppe, sworn to September 30, 2011, the

exhibits annexed thereto, and the accompanying memorandum of law, Sontag will move

this Court, before the Honorable Robert D. Drain, United States Bankruptcy Judge, at

the United States Bankruptcy Court located 300 Quarropas Street, White Plains, New

York, on the 2nd day of November, 2011, at 10:00 a.m., or as soon thereafter as counsel

can be heard, for an order, pursuant to Section(s) 105, 362 and/or 543 of the

Bankruptcy Code, relieving Sontag from the automatic stay of proceedings, if

necessary, and:

        (1)    approving the final account of Sontag, in his capacity of Temporary

Receiver appointed in a State court action entitled Bronx VIII, LLC. v. 2345 Associates

Inc., et al., Supreme Court, Bronx County (Index No. 308448/09) (hereinafter "the State

Court Action"), of the equipment, personal property and assets of the defendants in the State Court Action and all of the rents and profits then due or which thereafter became due, derived from eight multiple dwellings located at, and known by the street addresses of: 2265 Morris Avenue, 2271 Morris Avenue, 735 Bryant Avenue, 2345 Crotona Avenue, 3212 Cruger Avenue, 2350 Creston Avenue, 1221 Sheridan Avenue and 1225 Sheridan Avenue, all in the Bronx (collectively "the Premises");

(2)     approving and awarding Sontag a commission in the sum of $203,859.30 and reimbursements to him in the sum of $292.10 for expenses he has advanced, making in all the sum of $204,151.40;

(3)     approving or ratifying, *nunc pro tunc*, Sontag's payment of $292,569 in compensation to All City Realty Corp., by Raphael Soloff, his managing agent;

(4)     approving and awarding Sontag's attorney, Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty, P.C., by Gary Hoppe, Esq., a counsel fee of $47,727.70 and reimbursements to it for disbursements made on behalf of the receivership of $1,040.85, for a total of $48,768.55;

(5)     discharging Sontag and his surety from their respective positions;

(6)     canceling the surety bond;

(7)     because there are no funds on hand in the temporary receiver's estate account, directing plaintiff in the State Court Action to make the following payments:

(a)     $27,099.66 to Sontag, representing $204,151.40 in commissions and expenses which Sontag is asking this Court to approve for the period from November 9, 2009 through April 30, 2011, less the sum of $38,729 previously awarded by the State Court and received by Sontag as an interim commission, and less the sum

of $138,323 advanced to and received by Sontag from the State Court Plaintiff's predecessor-in-interest on account of his claim for commissions;

(b)     $22,393.55 to Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty, P.C., by Gary Hoppe, Esq., representing $48,758.55 which Sontag is asking this Court to approve for legal services rendered and disbursements incurred during the period November 24, 2009 through June 30, 2011, less the sum of $11,501.10 previously awarded by the court in the State Court Action as and for an interim fee for services and disbursements, and less $11,873.90 advanced to Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty by the State Court Plaintiff's predecessor-in-interest on account of Kantor Davidoff's claim for attorney's fees and disbursements;

(c)     additional fees in the amount of $22,790.00 for services rendered by Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty, P.C. on behalf of Sontag subsequent to June 30, 2011 through September 19, 2011 and additional disbursements in the amount of $1,486.93 incurred by Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty, P.C. on behalf of Sontag/the receivership after June 30, 2011;

(d)     $155,933.78 to Sontag to pay the balance due trade creditors whose outstanding bills to the estate for products and services used at the Premises had accrued, but were not yet due as of April 30, 2011 and which have only partially been paid;

(8)     granting such other and further relief as may appear just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to Rules 9006-1 and 9070-1 of the Local Bankruptcy Rules for the Southern District of New York, responsive papers, if

any, shall be electronically filed and served in such as fashion so as to be received by Sontag's attorneys, Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty, P.C., 51 East 42nd Street, New York, New York 10017, Attn: Gary Hoppe, Esq., at least seven (7) days prior to the return date of this motion, with a "chambers copy" of said papers delivered to the Chambers of the Hon. Robert D. Drain.

Dated: New York, New York
      October 3, 2011

                    KANTOR, DAVIDOFF, WOLFE,
                    MANDELKER, TWOMEY & GALLANTY, P.C.
                    Attorneys For Albert Sontag, As Temporary
                    Receiver

                    By: _____
                          Gary Hoppe (GH-9575)
                    51 East 42nd Street
                    New York, New York 10017
                    (212) 682-8383
                    e-mail: hoppe@kantorlawonline.com

TO:

Office of the United States Trustee
33 Whitehall Street, 21st floor
New York, NY 10004
(212) 510-0500

Backenroth Frankel & Krinsky, LLP
Attorneys for the Debtors
489 Fifth Avenue
New York, NY 10017
(212) 593-1100

Harry Zubli, Esq.
Attorney for Bronx VIII, LLC
1010 Northern Blvd., Suite 310
Great Neck, NY 11021
(516) 487-5777
email: hzubli@aol.com
email: hzubli@zubli-law.com

8.     This receivership required a great deal of work. The Premises contained more than 300 rental units and public areas, many/much of which had been neglected and were in a state of disrepair. 2345 Crotona Avenue had been declared unsafe, with parapets crumbling and in danger of collapse. All City and I made diligent efforts to correct the state of disrepair. Because rental income from the Premises was insufficient to pay for repair and rehabilitation, during the course of the receivership I requested and received from the former plaintiff and mortgagee (New York Community Bank ("NYCB")) advances of more than $720,000 to fund repair and rehabilitation work to the Premises.

9.     There were many outstanding violations on the Premises at the inception of the receivership. As of April 2010, there were 3,040 violations of record, of which 394 were classified as "C" or hazardous violations. Using rents and advances, All City and I vigorously addressed and corrected many of the violations. On June 22 and September 3, 2010, the New York City Department of Housing Preservation and Development ("HPD") congratulated me for having successfully corrected a large percentage of the outstanding violations of record (see Exhibit "C" hereto). As of March 9, 2011, 1,856 violations had been corrected, 228 of which were classified as hazardous. This left 1,184 violations of record, although many of these had been repaired but not yet inspected by HPD.

10.    I could not have effectively addressed the shoddy condition of the Premises including, but not limited to, the outstanding violations, without the superb assistance of All City Realty and its staff. I visited the Premises, met with All City's personnel there and directed the repairs to be made and the order of such repairs. All City's staff was on site surveying the buildings, speaking with tenants, handling their complaints, supervising the on-site building superintendents, hiring contractors and

supervising their work, dealing with vendors and dealing with the governmental agencies that regulate multi-family housing in Bronx County, including HPD, the Department of Buildings and the Department of Social Services. All City also made sure that rents were collected either from tenants or through the Department of Social Services which issued checks on behalf of various tenants. A full description of the services performed by All City is set forth in the accompanying affidavit of Abraham Soloff.

11.     On January 12, 2011, I received a letter from HPD (see Exhibit "D" hereto) advising that HPD, the New York City Housing Development Corporation, and Mutual Housing Association of New York ("MHANY") were exploring a potential acquisition of the mortgage and note encumbering the Premises with the support of certain officials and community activists. In my capacity as Temporary Receiver, I had no interest in who acquired the mortgage and note or in the terms of the acquisition. NYCB, however, was very interested in these subjects, was negotiating a sale of the mortgage and note to a private party and was not interested in pursuing a transaction with MHANY.

12.     In March 2011, as NYCB's negotiations with the private party intensified, the local elected officials and community activists apparently realized that NYCB was not interested in pursuing a transaction with MHANY. They began holding press conferences about predatory lending and charged that mortgagees were not advancing funds to repair the neglected and run down properties that secured repayment of their loans. Almost immediately, stories began to appear claiming that the Premises were being neglected and that NYCB was not advancing sufficient funds to keep the Premises in good repair. In response to these stories, the Department of Buildings flooded the Premises with inspectors and issued 415 new violations within a two-week

period. The Premises had become "ground zero" in a political argument between elected officials and activists and NYCB.

13.    All City and I were overwhelmed by the need to deal with the new violations within such a short time, but nonetheless continued to provide services to tenants. We also continued to repair, operate, rehabilitate and manage the Premises, including addressing and attempting to remove old violations and the slew of new violations. In addition, All City continued its day to day job of billing and collecting rent, ordering and paying for supplies and services, paying the on-site superintendents and other workers, and keeping detailed financial records.

14.    Certain tenants moved to intervene in the State Court Action. Because their motion made it seem as if I, a court appointed fiduciary, had neglected my duties, I was compelled to respond to that motion and my counsel prepared and submitted responsive papers demonstrating the vigorous and effective efforts made by me and All City to clear the Premises of violations (see Exhibit "E" hereto).

15.    On March 29, 2011, I was notified that Bronx VIII, LLC had purchased the note and mortgage being foreclosed in the State Court Action (see Exhibit "F" hereto). It too opposed the tenants' motion to intervene. That motion was ultimately denied by the Court in the State Court Action. Bronx VIII, LLC then moved to be substituted as plaintiff instead of NYCB and to amend the caption in the State Court Action to reflect that substitution. Both requests were granted (see Exhibit "G" hereto).

16.    Bronx VIII, LLC then contacted me and advised that the State Court Action was near completion and expressed a desire to manage the Premises as a mortgagee-in-possession, pending the impending disposition of the State Court Action. Kantor Davidoff and the attorney for Bronx VIII LLC negotiated a stipulation and consent, to be

so ordered by the State Court, pursuant to which the receivership would terminate effective April 30, 2011.  On April 29, 2011, the Stipulation and Consent was "So Ordered" by the Court in the State Court Action (see "Exhibit "H" hereto).

17.     Pursuant to that "so ordered" stipulation, I transferred operation, control and management of the Premises to Bronx VIII LLC.  Commencing May 1, 2011, that entity took possession of the Premises for purposes of managing, leasing and operating the Premises and collecting and retaining all rents, issues and profits therefrom.  Bronx VIII LLC continued to employ All City Realty as its managing agent during the months of May and June, 2011 and paid it a management fee of 7% for both months, and apparently continued efforts to address the remaining violations and complete the process of undoing years of neglect and deferred maintenance.

18.     It is respectfully submitted that payment of a 7% management fee to All City for the extraordinary services it performed while engaged by me is fair and reasonable, and it is requested that this Court so find.  Had this been a typical case, with a smooth transition from one management company to another, a 5% commission might have been adequate for:  attending pre-transition meetings and inspections to plan the transition, keeping track of and collect rents, renting apartments, preparing payroll and paying workers, keeping premises clean and maintained, servicing and maintaining boilers and making sure that oil is delivered, making sure that supplies are ordered, maintaining records, keeping track of and paying vendor bills, making required regulatory filings and preparing monthly management reports for the owner.

19.     However, All City and I were faced with eight badly neglected and dilapidated buildings with both public areas and various apartments in urgent need of repair, without the luxury of a transition period from one owner to the next.  In addition to

attending to the typical functions of a receiver and managing agent, literally thousands of violations had to be addressed, vacant apartments had to be rehabilitated to be rented and occupied apartments had to be repaired so that tenants would pay rent. City government had to be contacted and arrangements made for two-party rent checks to be issued. Records had to be obtained from the recalcitrant owners (the Debtors herein) and tenants had to be contacted and convinced to pay their rent because services to the Premises would continue. These extraordinary services are more fully described in Mr. Soloff's annexed Affidavit of Services. Because of the need for these additional services, a commission of 7% to All City is fair and reasonable.

20.    Normally, building repairs and maintenance can only be paid with rent that is collected. However, All City and I were fortunate enough to be dealing with a responsible and responsive lender/mortgagee, NYCB. After discussions regarding the rehabilitation and repairs that were needed in the Premises that couldn't be funded from cash flow, NYCB agreed to advance moneys to me, which were placed in my receivership account and used to assist in funding the repair and rehabilitation of the Premises.

21.    All City was spending significant time dealing with the repair and rehabilitation of the Premises, including addressing the thousands of outstanding violations. Because its level of performance was so high and its contacts and credit relationship with vendors important to continued efforts to operate the Premises, it was eminently fair not only to pay All City a monthly management fee of 7%, but also to apply that percentage to all the money received by Sontag in his receivership account, not just rents. NYCB, which held the mortgage from the time of my appointment until one month before the receivership was effectively terminated in April 2011, never

objected to a 7% fee. It is therefore requested that this Court determine that in this case, a management fee of 7% of all sums coming into the estate is reasonable, and to authorize me, *nunc pro tunc*, to pay such management fee to All City on a monthly basis.

22.     As of April 30, 2011, I had received the sum of $4,179,921.16 from the operation of the Premises during the term of my receivership, including the sums advanced by NYCB. I disbursed the sum of $4,275,243.55. Even with the advances from NYCB, as of April 30, 2011, the Estate had disbursed $95,722.39 more than it had received. Since all rents paid on or after May 1, 2011 have been debited to the current mortgagee's account, the Estate had no cash on hand other than the sums described below which have also been disbursed (see paragraph 24 below).

23.     Each individual receipt and disbursement relating to the receivership is set forth in the management statements that All City Realty prepared each month. Summary management statements covering the periods ending December 2009, December 2010, and April 2011 are collectively annexed hereto as Exhibit "I."[2] The year to date ("YTD") columns on each of the summary sheets reflect the amount I received (including where applicable, advances from NYCB) and disbursed for that particular year. To the best of my knowledge, except as otherwise disclosed below, these are complete and true accounts of all the sums which came into my possession as Receiver in the form of rents, issues and profits of the Premises and all payments and disbursements of funds that I made.

---

[2]     Detailed records of each building's operations are voluminous, but available to the Court for inspection upon request.

24.    When I became Receiver, I purchased a policy of liability insurance covering the encumbered premises. I added Bronx VIII, LLC as an additional insured when it was substituted as plaintiff in the State Court action. When the Receivership was terminated, I decided to cancel the policy and obtain a refund of the unused premium. Before doing so, I provided Bronx VIII, LLC with an opportunity to either maintain the policy at its own cost or purchase a new policy. Bronx VIII, LLC declined to maintain the policy at its own cost. Accordingly, I cancelled the policy and in early September 2011 received a refund of $55,426.97. I deposited the refund into my Receivership account (see Exhibit "J" hereto) and have disbursed the deposited funds (see Exhibit "J" hereto) in partial payment of the $210,934.36 in unpaid invoices (see Exhibit "K" hereto) the Estate received from trade creditors who provided products and services used at the Premises and toward All City's payroll. No funds remain on hand in the Receivership account.

25.    On March 16, 2011, NYCB advanced an additional sum of $255,166.23 to the Estate (see Exhibit "L" hereto). $105,010.12 was earmarked for and used by me to pay off liens on two of the buildings. $138,322.60 was earmarked for and used by me to pay myself an advance against my claim for commissions. The remaining $11,873.90 was earmarked for and used by me to pay Kantor Davidoff an advance against its claim for legal fees and disbursements. NYCB's willingness to, in effect, privately make a payment on account of my claim for commissions and Kantor Davidoff's claim for counsel fees is a testament to the close working relationship between me and NYCB and demonstrates its acknowledgement of the fine work performed by me.

26.     The receipt of $255,166.23 from NYCB and the disbursement of this amount are included in the cash disbursements section of the attached summary management statements.  The portion of that sum received by me as advances against my commissions and Kantor Davidoff's attorney's fees have been omitted when calculating the total amount of my claim for commissions so as not to double count the same amount.

27.     As is more fully demonstrated in the accompanying memorandum of law, § 8004(a) of New York's Civil Practice Law and Rules ("CPLR") authorizes a receiver's commission of up to five per cent of receipts and disbursements, more typically calculated as 2½% of the amounts received and 2½% of the amounts disbursed.  Given the difficulty of managing the Premises and the limited resources that were available to me and the enormous repair and maintenance work for which I was responsible, I ask to be awarded the full five percent of receipts and disbursements.

28.     In making this calculation in this case, the sum of $150,196.50 (NYCB's March 16, 2011 advance) has been excluded because it was earmarked for and used to pay an advance to me ($138,322.60) against my claim for commissions and Kantor Davidoff ($11,873.90) against its claim for an attorney's fee and disbursements. Accordingly, my commission should be calculated as follows:

| Receipts | Disbursements |
|---|---|
| $4,179,521.16 | $4,275,243.95 |
| ( 150,196.50) | ( 150,196.50) |
| $4,029,324.66 | $4,125,047.06 |
| 2½% | 2½% |
| $100,733.12 | $103,126.18 |

This calculation results in a commission of $203,859.30.  I advanced $292.10 in reasonable and necessary disbursements for which I am also seeking reimbursement.

Accordingly, I am seeking and request an award of commissions and reimbursement of disbursements in the aggregate sum of $204,151.40.

29.     Where an Estate has no funds, Section 8004(b) of New York's CPLR authorizes the Court to direct the plaintiff in a foreclosure action to be responsible for paying commissions and disbursements. By order granted on February 15, 2011 by the State Court (see Exhibit "M" hereto), I was awarded an interim commission in the sum of $38,729.14, which was paid. Accordingly, it is requested that this Court credit the interim commission of $38,729.14 and NYCB's advance of $138,322.60 to me against the amount that Plaintiff in the State Court Action should be directed to pay, reducing its liability to $27,099.66.

30.     Annexed hereto respectively as Exhibits "N", "O" and "P" are invoices from Kantor Davidoff dated as of August 1, 2010, May 1, 2011 and July 1, 2011. Collectively, these invoices reflect the legal services performed by various attorneys at Kantor Davidoff on behalf of me/the receivership, and out-of-pocket disbursements it advanced from the beginning of the receivership through June 30, 2011. Each service is described in detail, including the dates on which they were rendered, the attorneys who rendered the services, the time expended, and their respective time charges. The invoices identify each disbursement and the amount. All the services Kantor Davidoff rendered and all the disbursements it advanced were reasonable, necessary and benefited the Estate.

31.     Exhibit "N", dated as of August 1, 2010, reflects a balance due for fees and disbursements through July 31, 2010 in the sum of $11,501.10. Pursuant to Exhibit "Q", the State Court granted me leave to pay Kantor Davidoff a portion of that amount ($6,742), which was paid, and I advanced the balance to Kantor Davidoff subject to

court approval of its fees.  Exhibit "O", dated as of May 1, 2011, reflects fees and disbursements of $18,904.35 incurred by Kantor Davidoff from August 1, 2010 through April 30, 2011.  When the advance of $11,873.90 made by NYCB on account of Kantor Davidoff's legal fees and disbursements is credited, a balance due of $7,030.45 results. Exhibit "P" hereto dated July 1, 2011 reflects fees and disbursements of $15,363.10 incurred during the period May 1, 2011 to June 30, 2011, for a total of $22,593.55.  It is requested that the State Court Plaintiff be directed to pay that sum to Kantor Davidoff, as well as additional fees of $22,790.00 earned and disbursements in the sum of $1,360.83 advanced subsequent to June 30, 2011 (see Exhibit "R" annexed hereto). The additional fees incurred include those for services rendered in preparing the instant motion.

32.     The revenues I received from the operation of the Premises were insufficient to pay a number of expenses.  A number of the apartments were vacant and required rehabilitation before they could be rented.  Even after they were occupied, a number of tenants either could not or would not pay rent on a timely basis, or make any payments at all.  An enormous amount of repair and maintenance was required in these buildings and in many apartments.  Many violations had to be addressed and corrected. As a result, I instructed All City to hold all bills for at least 30 days in an attempt to cope with a negative cash flow.  As a result, the Estate received and did not pay invoices totaling $210,934.36 from trade creditors who provided products and services used at the Premises (see Exhibit "K" hereto).  Each of the invoices had accrued, but either had not been paid, or in some cases, had not been received as of April 30, 2011.  As mentioned above, from the insurance refund that I received, partial payments totaling $50,000.11 have been made toward these invoices and $436.86 of the refund was

applied toward the City's payroll account to cover a deficit on payroll made to these buildings. I am not seeking a commission with respect to the receipt of the refund and partial payment of these invoices/payroll. They are not included in the receipts and disbursements on which my commission has been calculated. Nonetheless, since these trades people rendered goods and services for which they are entitled to be paid, it is requested that the Court, and the State Court Plaintiff to pay the outstanding balance of these invoices, the outstanding monies to me to pay these outstanding invoices.

WHEREFORE, the application bar should be granted in its entirety

_____
ALBERT SONTAG

Sworn to before me this
3RD day of October, 2014

_____
Notary Public

LAWRENCE A. MANDELKER
Notary Public, State of New York
No. 4941452
Qualified in Westchester County
Commission Expires Aug. 15, 201_

Kantor, Davidoff, Wolfe, Mandelker,
Twomey & Gallanty, P.C.
By: Gary Hoppe (GH-9575)
Attorneys for Albert Sontag
  as a Temporary Receiver
51 East 42nd Street
New York, NY  10017
(212) 682-8383

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In Re:

    2271 ASSOCIATES INC., et al.,

                         Debtors.
-----------------------------------------------------------------X
STATE OF NEW YORK   )
                           )
COUNTY OF BRONX     )

**Return Date:
11/2/11 – 10:00 a.m.**

Case Nos. 11-23351
Through 11-23358 (RDD)
(Chapter 11)

**AFFIDAVIT BY
ABRAHAM SOLOFF**

Abraham Soloff, being duly sworn, deposes and says:

    1.    I am one of the three owners of All City Realty Corp. ("All City").  My

brothers Raphael and Dov are the other owners.  We have been in the business of real

estate management for more than thirty (30) years.  We presently manage 45

properties.  I have personal knowledge of the management services rendered by All

City in connection with the mortgage foreclosure action in the Supreme Court of the

State of New York, Bronx County, now entitled Bronx VIII, LLC. v. 2345 Associates Inc.,

et al., (Index No. 308448/09) (hereinafter "the State Court Action"), and make this

affidavit in support of the present application for payment of fees/commissions.

    2.    By order granted on December 14, 2009, All City, by my brother Raphael,

was appointed as the managing agent for Albert Sontag ("Sontag" or the "Receiver"),

the temporary receiver of the rents, issue and profits of the eight buildings that are

encumbered by the mortgage that was foreclosed in the State Court Action (the "Premises").

3.     The Premises consists of eight separate residential buildings. Seven are five stories tall and the eighth is six stories tall. Each building contains approximately 40 tenants. At the time All City was appointed, the Premises were in a significant state of disrepair. They were run down and dilapidated and apparently suffered from years of neglect.

4.     The first thing that we and the Receiver did was to inspect the Premises and determine what conditions needed immediate attention. One of the buildings, 2345 Crotona Avenue, had been cited as unsafe. Its parapets were crumbling and there was a danger of falling masonry. New York City had made arrangements to perform emergency repairs and bill the cost to the owner. We immediately brought in contractors to protect the residents from falling masonry, made the emergency repairs, and cured the condition. The Receiver was involved throughout this process.

5.     The Debtors were not particularly cooperative when we sought to determine the identities of the tenants of the Premises, the condition of each tenant's apartment and the amount of rent being paid and to obtain the leases for the apartments. Many tenants complained – and we observed – that the ceilings in their apartments were collapsing, fixtures were falling off walls, there was peeling paint and mold, and there was no heat or hot water in various apartments.

6.     All City had the boilers checked and repaired where necessary. Initially taking advantage of our credit arrangements with our contacts, we made sure that oil was timely delivered and that oil bills were timely paid. We undertook a program of

emergency repairs to address the conditions we found in various occupied apartments, particularly those conditions such as peeling paint and mold that are considered hazardous.

7.    A number of the apartments were vacant.   We inspected the vacant apartments to see which were most feasible to fix up and rent.   We visited each apartment, installed new kitchens, fixed falling ceilings, fixed leaky fixtures, rehabilitated walls, ceilings and floors, plastered, pointed, painted and then performed the lead abatement required by law before an apartment can be rented.   We registered the apartments with the City Department of Homeless Services and prepared them for inspection so that they would qualify for placement of tenants by the City of New York.

8.    The public areas and the exteriors of the Premises were also in a state of disrepair.   Many of the outer doors to the buildings did not lock and intercoms did not work.   Outsiders that were loitering in the buildings were removed and the doors repaired.   Debris was removed from hallways.   Walls, floors and ceilings were repaired. Light fixtures were put in working order.   Broken stairways and banisters were repaired. The buildings were repainted and pointing work to exterior walls was performed.   We made sure that the onsite superintendents were paid and well supplied and kept the Premises clean and maintained.

9.    Each time we embarked on a repair and rehabilitation program we made recommendations to the Receiver concerning the scope of the work to be done and, upon his approval, procured either bids or proposals from contractors.   We then supervised the jobs, saw that the Receiver was properly billed and that the contractors were paid.

10.     A major part of our job was to aggressively address the thousands of violations that had been placed on the buildings, even though the Premises did not generate sufficient cash flow to pay for correction of the violations.  The Receiver informed us that he was working with the lender and that, when needed, it would advance funds to the receivership to pay for the work.

11.     The earliest New York City Department of Housing Preservation and Development ("HPD") reports in my possession are from April 2010.  As of that date, there were 3,040 open violations, of which 384 were hazardous.  We entered into Voluntary Repair Agreements with HPD for some of the buildings.  Indeed, HPD sent letters to the Receiver congratulating him for his efforts.  By March 9, 2011, we had cleared over 1,850 violations, reducing the number of outstanding violations to 1,184, of which only 166 were considered hazardous.  No repair to the Premises or to any apartment was done without first discussing it with the Receiver and obtaining his approval.

12.     In March 2011, after the Premises became the focus of a political media firestorm, inspectors from the Buildings Department descended on the Premises. Between March 10 and March 14, 2010, an additional 415 violations were placed on the Premises, of which 30 were considered hazardous.  As fast as we cleared existing violations, they were replaced by new ones, but we continued our best efforts to cure all violations placed on the Premises.

13.     Rent collection was difficult.  Many tenants refused to pay their rent until they were satisfied that repairs to the building and their apartments would be made. Many tenants had to be evicted without the Receiver being able to recover back rents.

Where necessary, we served five-day notices and appeared in housing court. The Receiver rented their apartments to new tenants from whom the estate collected rent. We billed and collected rents and kept in contact with tenants. We also helped tenants apply for assistance from the City Department of Social Services to pay their rent.

14.     When rents were paid, we posted the payment in our electronic bookkeeping system to make sure the tenants were properly credited and then deposited the rents into the Receiver's account. We ordered supplies and services, received and kept track of vendor bills, prepared checks for the Receiver to pay bills, and prepared and issued monthly management reports and summary reports to the Receiver. Because of the size of the monthly reports, the summary reports have been submitted with the Receiver's application.

15.     The detailed monthly reports supplied to the Receiver identified each building that All City managed for the Receiver (Buildings 75 through 82 refer to the Premises), cash receipts by month and year-to-date, disbursements on a monthly and year-to-date basis, net cash flow (receipts minus disbursements) on a monthly and year-to-date basis, opening cash on hand and closing cash on hand each month, a disbursement report of each disbursement by check number, date, amount, payee, invoice number and invoice date, and a billing status report describing outstanding balances owed by each tenant at the beginning of the month, the amount billed, and the amount collected during the month. During the course of the receivership, total receipts amounted to $4,179,921.16 and total disbursements amounted to $4,275,243.55. Cash on hand as at April 30, 2011 was therefore reported as ($95,722.39). Because of an insurance refund received by the Receiver, the receiver's account contains $426.86.

16.     Because of All City's excellent credit history, we would generally order goods and services for the Premises, receive a bill and pay it within 30 days. As a result, the expenses that were incurred in December 2009, such as for ordering oil to heat the Premises, were not paid until January 2010, at the earliest. This pattern continued for the balance of the receivership. Exhibit "K" to the application is a list and copies of the unpaid bills that had accrued as at April 30, 2011. I compiled the list and copied the bills that constitute the exhibit. Exhibit "K" contains a list and unpaid bills in the aggregate sum of $210,934.36, the unpaid balance of which has been reduced to $155,933.78 after application of an insurance refund of $55,426.97 recently received by the Receiver. $55,000.11 was paid toward those unpaid bills and $426.86 was applied to All City's payroll. No funds are currently on hand in the receivership account.

17.     When the Receivership terminated, Bronx VIII LLC asked All City to continue temporarily as its managing agent. We managed the Premises during May and June 2011 and received a 7% commission during those months for our services. All City has not managed the Premises since the end of June 2011.

_____
Abraham Soloff

Sworn to before me this
2 6 day of September, 2011
_____
Notary Public

RAPHAEL A. SOLOFF
Notary Public, State of New York
No. 24 — 4975854
Qualified in Kings County
Commission Expires Dec 26, 2014

6

Kantor, Davidoff, Wolfe, Mandelker,
Twomey & Gallanty, P.C.
By: Gary Hoppe (GH-9575)
Attorneys for Albert Sontag
  as a Temporary Receiver
51 East 42nd Street
New York, NY  10017
(212) 682-8383

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In Re:

     2271 ASSOCIATES INC., et al.,

               Debtors.
-----------------------------------------------------------------X
STATE OF NEW YORK   )
                    )
COUNTY OF NEW YORK )

**Return Date:**
**11/2/11 – 10:00 a.m.**

Case Nos. 11-23351
Through 11-23358 (RDD)
(Chapter 11)

**AFFIDAVIT BY**
**GARY HOPPE, ESQ.**

     GARY HOPPE, an attorney admitted to practice in the courts of the State of New

York, being duly sworn deposes and says:

     1.     By order granted on December 14, 2009 in a mortgage foreclosure action

commenced in 2009 in the Supreme Court of the State of New York, Bronx County,

entitled Bronx VIII, LLC[1]. v. 2345 Associates Inc., et al., (Index No. 308448/09)

(hereinafter "the State Court Action")[2], I, on behalf of the law firm in which I am a

partner, Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty, P.C. ("Kantor

Davidoff"), was appointed as counsel to Albert Sontag, the temporary receiver

appointed in the State Court Action (variously "Sontag" or "the Receiver") . I make this

affirmation in support of that aspect of the Receiver's application to pay Kantor Davidoff

---

[1]    Bronx VIII LLC purchased the mortgage being foreclosed upon and was substituted as
plaintiff in the State Court Action by order dated April 29, 2011 and the caption of the State
Court Action amended accordingly.
[2]    The Debtors are all named defendants in the State Court action.

a counsel fee of $48,585.45 for its services from November 24, 2009[3] through June 30, 2011, and for reimbursement of the disbursements it advanced in the sum of $1,040.85 during the same period, for a total of $48,768.55 – less of course advances toward fees that were previously received by Kantor Davidoff and which are discussed below and in the accompanying application. This affirmation is also submitted in support of that aspect of the instant motion seeking payment of additional fees of $22,790.00 for services Kantor Davidoff rendered after June 30, 2011 through September 19, 2011 (including services rendered in preparing this motion) and $1,486.93 in additional disbursements incurred in connection with services to the Receiver.

2. Since Sontag's appointment as temporary receiver in the State Court Action, Kantor Davidoff has counseled and advised him and, when requested, has drafted documents for him. At the Receiver's request, we drafted a Notice to Attorn, moved for permission to hire a managing agent and counsel, moved to amend the order of appointment to change the bank in which the Receiver held his receivership account, moved for an interim commission, and coordinated with the lender's counsel concerning its response to the attempt by various elected officials and tenant advocates to demonstrate that the lender and the Receiver were allegedly neglecting the Premises. Kantor Davidoff also dealt with a personal injury claim that had been filed and made sure the Receiver's insurance carrier was notified promptly.

3. We have also participated in a number of telephone and face-to-face conferences with the Receiver and the mortgagee's special counsel in order to brief

---

[3] Because the Receiver is not an attorney, he required the services of a lawyer to negotiate an agreement with the lawyer for Plaintiff's predecessor-in-interest, draft a stipulation agreeing to the appointment of counsel and a managing agent, and present it to the Court for its approval. Counsel also prepared a notice to attorn. Kantor Davidoff spent 5.2 hours performing these services, all of which are set forth in the attached exhibits to the Receiver's application.

them on the Receiver's success in curing thousands of violations on the eight (8) buildings that collectively constitute the encumbered premises ("the Premises"), thereby aiding the mortgagee and its special counsel in responding to inquiries from members of the New York City Council concerning the possibility of a disposition of the Premises to a community backed organization. In addition, we prepared papers in opposition to a motion by tenant activists to intervene in the State Court Action, since their motion was based in part on the Receiver's alleged failure to protect the property.

4.       When New York Community Bank assigned the mortgage to Bronx VIII, LLC, the latter advised us that it wished to operate the premises as a mortgagee in possession. We negotiated and prepared a stipulation providing for termination of the receivership, subject to the Receivers' duty to account. Pursuant to that stipulation, we prepared a proposed final account and a proposed further stipulation pursuant to which Bronx VIII, LLC would consent to the account.

5.       However, Bronx VIII, LLC later decided not to consent. We therefore prepared and filed a formal motion in the State Court Action to settle the Receiver's final account, etc. Prior to the return date of that motion, the Debtors filed the within proceedings. Although we did not believe that the automatic stay affected that motion, out of an abundance of caution and respect for this Court, we withdrew that motion and are filing the instant motion in these proceedings under the applicable sections of the Bankruptcy Code.

6.       Annexed hereto as Exhibits "N", "O" and "P" are the invoices rendered by Kantor Davidoff and dated as of August 1, 2010, May 1, 2011 and July 1, 2011. Collectively, they reflect the legal services performed by various attorneys at Kantor

Davidoff on behalf of the Estate from November 24, 2009 through June 30, 2011. Each service is fairly and accurately described in detail, including the dates on which they were rendered, the attorneys who rendered the services, the time expended, and their respective time charges. The invoices provide the same fair and accurate detail for the disbursements that Kantor Davidoff had advanced. The invoices show that Kantor Davidoff billed the Receiver $48,585.45 in legal fees and $1,040.85 in disbursements, for a total of $48,768.55.

7.      Kantor Davidoff has spent 72.8 hours of time during this period in rendering services to the Estate, broken down as follows: Gary Hoppe, 2.9 hours; Lawrence A. Mandelker, 31.2 hours; Matthew C. Kesten, 5.3 hours; and Daniel Kokhba, 20.6 hours. All of the time was reasonable and necessary. Likewise, the disbursements advanced by my firm were each reasonable and necessary.

8.      My billing rate is $425/hr; Mr. Mandelker's billing rate is $600/hr; Mr. Kesten's billing rate is $450/hr; and Mr. Kokhba's billing rate is $350/hr. Our respective *curriculae vitae* are collectively annexed hereto as Exhibit "S." They demonstrate our professional skills, backgrounds, reputations, experience, and standing in the community.

9.      As stated in the Receiver's affidavit, against an invoice dated as of August 1, 2010 (see Exhibit "N") reflecting a balance due for fees and disbursements through July 31, 2010 of $11,501.10, the State Court granted the Receiver leave to pay Kantor Davidoff a portion of that amount ($6,742 – see Exhibit "Q",), which was paid, and the Receiver advanced the balance to Kantor Davidoff subject to court approval of its fees. New York Community Bank (the former mortgagee and plaintiff) paid us the sum of

$11,873.90 as an advance against our claim for attorneys' fees and disbursements. When these funds are credited against our claim, the outstanding balance is reduced to $22,393.55.

10.     From July 1, 2011 through September 19, 2011, Kantor Davidoff has rendered an additional 45.5 hours of service to the estate, for a fee of $22,790.00, and advanced disbursements in the sum of $1,486.93, for a total of $24,276.93.   The services rendered and the amounts charged/incurred were reasonable, necessary and benefited the estate and include the services of an associate, Jennifer Lee, whose billing rate is $350/hr and whose curriculum vitae is included in Exhibit "S".  Exhibit "R" are our invoices for those services and disbursements.  Exhibit "R" provides the same level of detail for the services and disbursements identified in our prior invoices (see Exhibits "N", "O" and "P" hereto).

WHEREFORE, it is respectfully requested that the motion at bar be granted in all respects.

_____
GARY HOPPE

Sworn to before me this
3rd day of October, 2011

_____
Notary Public

MATTHEW C. KESTEN
Notary Public, State of New York
No. 02KE4841667
Qualified in Westchester County
Commission Expires June 30, 20 15

5